## Case No. 5,682a.

### GRANDE et al. v. FOY.

[Hempst. 105.] [1]

Superior Court, Territory of Arkansas. Jan., 1831.

#### EJECTMENT—HISTORY OF.

1. The action of ejectment was authorized by our laws as far back as 1807, and continued to exist without the fiction of "lease, entry, and ouster," until 1816, when the common law was adopted by positive enactment, and the action of ejectment introduced according to the forms of the common law.

2. History of the action of ejectment reviewed, and our legislation on the subject referred to.

Appeal from Crittenden circuit court. [Ac-tion by Saline Grande and others against Catharine Jane Foy.]

Before JOHNSON, ESKRIDGE, and CROSS, JJ.

CROSS, J. This was an action of ejectment, brought by the appellants against the appel-lee, in the circuit court of Crittenden county, for the recovery of a tract of land, contain-ing five hundred and forty-four acres and forty-four hundredths of an acre. At the last May term of the circuit court of that county, a motion was made on the part of the ap-pellee to dismiss this cause upon the ground that there was no law in force in this territory by which the title to real estate could be tried, and the possession recovered by action of ejectment. This motion was sustained by the court, and the cause dismissed accordingly. To this decision, the appellants by their at-torney excepted, and prayed an appeal to this court.

The record presents but a single question, namely, whether the court below erred in sus-taining the motion to dismiss upon the ground, that by the laws of this territory the action of ejectment could not be maintained. The ac-tion of ejectment is peculiar to the common law, and was invented in England during the reign of Edward II., or in the early part of that of Edward III. Adams, Eject. c. 1, pp. 7, 8. On its first introduction, it was a rem-edy afforded a lessee for a term of years, when he had been ousted by the lessor for the recovery of his term, or the remainder of it, with damages. 3 Bl. Comm. 199. During the reign of Henry II. it was converted into a method of trying titles to the freeholds, but did not assume its fictitious form until the exile of Charles II. From the period of its first having been used in trying titles to land, up to the time last mentioned, an actual lease, entry, and ouster, which, according to its pres-ent modification, constitutes the fiction, was necessary, and without it the action could not be sustained.

By a recurrence to the history of our laws, and an inquiry, first, as to the period when the common law was adopted in this country; and secondly, whether as it now stands, the action of ejectment is authorized, we shall be

---

[1] [Reported by Samuel H. Hempstead, Esq.]

enabled to arrive at a correct conclusion in regard to the question before us. In considering the first branch of the subject, it may be necessary to declare that by the treaty of cession in the year 1803, between France and the United States, the province, as it was then called, of Louisiana, was acquired; a portion of which now comprises Arkansas. At the first session of congress after the treaty, the president of the United States was authorized to take possession of the country, and a law was passed, entitled "An act erecting Louisiana into two territories, and providing for the temporary government thereof." By this act all west of the Mississippi river, and south of latitude thirty-three north, was called the "Territory of Orleans," and the residue the "District of Louisiana." The same act vested in the governor and judges of the territory of Indiana the power to make all laws which they might deem conducive to the good government of the inhabitants of the district, and declared that the laws then in force in the district, not inconsistent with its provisions, should continue in force until altered, modified, or repealed. Act 1804, 3 Bior. & D. Laws, 608, 609 [2 Stat. 283]. The succeeding session of congress in 1805, passed a law further providing for the government of the district of Louisiana, by which the name was changed from that of "District" to that of the "Territory" of Louisiana, and a different legislative power created and vested in the governor and three, or a majority, of the judges of the territory. A provision was also inserted continuing all such laws and regulations as were in force at the time of its passage until altered, modified, or repealed. 3 Bior. & D. Laws, 659, 660 [2 Stat. 331]. That act continued in force until December, 1812, when the organic law of Missouri took effect. By that law the name of the "Territory of Louisiana" was changed to that of "Missouri," and all laws and regulations in force at the time of its passage, and not inconsistent with its provisions, were declared to be in force until altered, modified, or repealed. In March, 1819 [3 Stat. 493], the law was passed creating the territory of Arkansas, in the southern part of the Missouri territory, which continues in like manner all such laws and regulations as were in force at the time of its passage until modified or repealed. From this view it will be seen, that such laws and regulations as were in force at the time of the acquisition of Louisiana, were continued from time to time up to the date of our organic law in the year 1819, except such as were inconsistent with the constitution and laws of the United States, and until altered, modified, or repealed.

In 1816 the legislature of the Missouri territory passed a law, by which it is enacted, "that the common law of England, which is of a general nature, and all statutes of the British parliament in aid of, or to supply the defects of the common law, and of a general nature and not local to that kingdom, which common law and statutes are not contrary to the laws of this territory, and not repugnant to, nor inconsistent with, the constitution and laws of the United States, shall be the rule of decision in this territory until altered or repealed by the legislature." Geyer, Dig. 124. By that act, which is still in force, the common law of England, of a general nature, is introduced, except where it conflicts with our statutes, or is repugnant to or inconsistent with the constitution and laws of the United States; and here, perhaps, the inquiry might be closed as to the period when the common law was adopted. To prosecute it further would be rather a matter of curiosity than necessity upon the present occasion. We are induced to believe, however, from the numerous common law phrases and terms used in our statutes anterior to the passage of the law of 1816, that it must have been adopted either by statutory provision or by common consent at an earlier day. As far back as the year 1807, we find most of the common law actions mentioned in the acts of the legislature of Louisiana, such as trespass vi et armis, ejectment, case, debt, covenant; also, the terms murder, presentment, and indictment. Demurrers, general and special, are spoken of, and pleas of various kinds known to be authorized by the common law. In using these terms, and recognizing such actions and pleas, did the legislature intend those only authorized by the laws and regulations in force at the time Louisiana was acquired? If so, it is doubtful whether the laws of France or Spain should have been resorted to, to find their definitions, and the manner of proceeding in them, inasmuch as the province of Louisiana had been acquired from the latter by virtue of the treaty of San Ildefonso, in October, 1800. It would certainly be conjectural altogether to say the laws of either of these governments were intended, and to say both would be absurd. To arrive at the conclusion, then, that the legislature intended actions, pleas, and terms defined by the laws of France or Spain or both, we have first to suppose their existence, and from this hypothetical existence the deduction must be made, that the legislature intended such actions, pleas, and terms, as were never known to their laws, or the laws of one of those governments. This would be a conclusion alike inconsistent with the rules of logic and law, and the legislature never so intended it. How then, it may be asked, are we to ascertain the meaning of the legislature in speaking of such actions, pleas, and terms, as are known to be sanctioned by the rules of the common law? Certainly, by referring to the common law itself, thereby avoiding the necessity of a hypothetical existence.

In corroboration of the opinion that the legislature alluded to the common law actions, pleas, and terms, is the fact, that all the proceedings had in the courts, immediately after the passage of the acts in which they are mentioned, were in accordance with the rules of the common law. The maxim, therefore,

applies with great force, "contemporanea expositio est fortissima in lege." The inquiry may be made. as to what has become of the laws and regulations declared to be in force by the act of congress, passed in 1804. We would answer, that many have been abolished, or superseded by our statutes, and others have shared the fate of all ancient customs, when there no longer exists any necessity for their observance. The conclusion, therefore, is well founded, that the common law was, at least partially, adopted as far back as the year 1807, and indeed prior to that time, and it is not very material whether by common consent or by statute.

The second branch of the subject to be considered is, whether, by the common law as it now stands, the action of ejectment is authorized.

It has been contended that the act of 1816, adopting the common law, did not introduce it, because a statute was then in force, passed by the legislature of Louisiana in the year 1807, which is contrary to, and inconsistent with, that portion of the common law which relates to it. The statute alluded to is in the following words: "In all actions of ejectment, the plaintiff shall declare in his proper name, and instead of the fictitious suggestion of lease, entry, and ouster, shall state that he is legally entitled to the premises," &c. Geyer, Dig. p. 176. The legislature, by the act of 1816, have certainly introduced no part of the common law inconsistent with statutory provisions in force at the time of its passage, and hence it is clear, that the fiction, invented, as we have shown, during the exile of Charles II., pertaining to the action of ejectment, was excluded, the act of 1807 then being in force. But this does not prove that the legislature, by the qualifications inserted in the act of 1816, intended to exclude it according to its ancient form. The argument on the part of the appellee, appears to be based upon an assumption, that the action could not, at the time of the passage of the law of 1816, be maintained, by the rules of the common law, without the fictions. This is untrue. The lessee in England, may still prosecute ejectment for the recovery of his term, where he has been ousted, without the fictitious suggestions of lease, entry, and ouster, in the same way he could have done before its enaction, and so in this country after the time of 1807. That the action of ejectment was authorized, at the time of the passage of that law, and afterwards, is as clearly indicated as it could be done without using express words for that purpose. It may be regarded as a negative statute, with an affirmative meaning. In 1823, the legislature of this territory passed an act, repealing the act of 1807, by which it evidently intended to revive the fiction.[2] But this does

not change the matter in the slightest degree, according to the view we have taken, so far as the existence of the action itself is concerned. At the same session, and after the passage of the repealing act, just mentioned, an act was passed, regulating evidence in actions of ejectment; and if it should still be considered doubtful, as to the existence of the action under our laws, prior to 1816, and even afterwards, that act, we think, would settle the question. It is in these words: "Be it enacted, that the final certificate of any receiver of the United States land districts, in this territory, and certificates of confirmations of Spanish claims, shall be sufficient evidence of title, to commence and prosecute any action of ejectment," &c. This act clearly recognizes the existence of the action, and were we to say that it could not be sustained, we should virtually nullify the act, because, without the existence of the action, the evidence it authorizes could not be received. We are, therefore, of opinion that the action of ejectment was authorized by our laws, as far back as the year 1807; that it continued to exist without the fiction, until 1816, when the common law was adopted by positive enactment; that if it had not before existed, that act would have authorized it; that the act of 1823, repealing the act of 1807, did not affect its existence; and if we are deceived in all these positions, the act of 1823, regulating the evidence in ejectment, alone would introduce it. Judgment reversed.

GRAND ERA, The (HARP v.). See Case No. 6,084.

GRAND LODGE OF FREE & ACCEPTED MASONS (SECOND NAT. BANK OF ST. LOUIS v.). See Case No. 12,603.

GRAND STREET RY. CO. (MOWRY v.). See Case No. 9,893.

GRAND TRUNK RY. CO. (CUMMINGS v.). See Case No. 3,475.

GRAND TRUNK RY. CO. (HARVEY v.). See Cases Nos. 6,180, 6,181.

GRAND TRUNK RY. CO. (SAYLES v.). See Case No. 12,419.

GRAND TRUNK RY. CO. (WALKER v.). See Case No. 17,070.

---

[2] Note by the Judge: Judge Cross does not consider the question whether the fiction is authorized by the common law, as involved in the present case, and does not express an opinion on that subject.

